UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**DAMON CHASE**
**300 Branch Ave,**
**Apt. 801**
**Temple Hills, Maryland 20748**

    Plaintiff,                                                     Civil Action No.: 8:21-cv-939

v.

**MELWOOD HORTICULTURAL**
**TRAINING CENTER, INC.**
**5606 Dower House Road**
**Upper Marlboro, MD 20772**

    Defendant.

---

## COMPLAINT
---

Plaintiff Damon Chase, for his complaint against Melwood Horticultural Training Center, Inc. LLC ("Melwood"), and respectively avers as follows:

### PARTIES

1. Plaintiff Damon Chase is a resident of the state of Maryland.

2. Defendant Melwood Horticultural Training Center, Inc. LLC. is a business principally based in state of Maryland.

### JURISDICTION AND VENUE

3. This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331.

4. Venue is proper under 28 U.S.C. § 1391(b) because Defendants conduct business and can be found in this judicial district.

5. The events giving rise to the claims in this action occurred in this judicial district.

6. Plaintiff has exhausted all administrative remedies with the Equal Employment Opportunity Commission.

## FACTUAL BACKGROUND

### *Chase's* Allegations of Discrimination

7. Damon Chase is a 31-year-old individual with a disability.

8. Melwood is a Prince Georges County, Maryland a nonprofit organization, that provides jobs and opportunities for individuals with disabilities. Melwood supports children, youth, and adults of differing abilities by providing employment, job training, life skills, improvement, and supportive and recreational services to people with disabilities.

9. Melwood has several government contracts to provide custodial services to federal office buildings. One of those contracts is with the Department of Justice in Washington, D.C. ("DOJ"), the location where Chase worked.

10. In or about December 2017, Melwood offered employment to Chase to be a custodial worker at the DOJ building in Washington D.C.

11. Melwood employees have access to Melwood human resources officials to contact, in the event the employee experiences difficulties at the DOJ.

12. In March 2018, Chase started working as a Lead Custodian at the DOJ. He worked alongside another Lead Custodian, Robert Edwards. At DOJ, both were supervised by a DOJ employee named Chamisa Banks.

13. From the start, it was clear that Banks was unhappy with Melwood employees reporting to her at DOJ. In fact, Banks consistently and routinely referred to Chase and Edwards as the "Melwood workers." Banks often chastised Chase because of his disability and consistently told him that he was a "Melwood worker" and that "Melwood workers" were not as skilled the previous contract employees at DOJ. Banks often told Chase that she "runs the DOJ."

14. From the beginning, Banks referred to Chase as "retarded," "ni**ers," and "stupid." This language started from the beginning of Chase's employment, and up to his termination.

15. In a manager meeting with Banks, Banks stated to Chase, "are you stupid or retarded."

16. Banks continued to refer to Chase as "retarded" while he worked at DOJ.

17. In or about April to May 2018, Chase reported the incidents to Melwood. But Melwood did nothing. In fact, Melwood went to great lengths to shield Banks from Chase's discriminatory complaints of harassment from Banks.

18. Between April 2018 to August 2018, Chase continued to endure severe discriminatory hostile treatment from his supervisor Banks. Banks continued to tell Chase that he was "retarded" "couldn't do anything right," and that he was a "ni**er."

19. Between April 2018 to August 2018, Banks routinely told Chase that she was aware of his complaints of discrimination to Melwood and that his complaints of discrimination to Melwood had no bearing on her employment at DOJ.

20. In or about June 2018, Chase conducted phone check-ins with Melwood after each assignment that he completed because Banks routinely lied by telling Melwood that Chase was not completing assignments. After misleading Melwood about Chase, Banks proceeded to conduct meritless write-ups.

21. Chase routinely took pictures of assignments that he completed just to verify the work he was doing.

22. In or about September to October 2018, Chase requested that Melwood transfer him out of DOJ. Melwood refused the request.

23. In or about February 2019, Chase asked to Melwood to transferred him out of DOJ. Once again, Melwood refused the request.

24. Throughout his tenure at DOJ, Chase consistently complained about the discriminatory treatment from Banks. In fact, Chase complained of discrimination to at least 6 different Melwood human resources officials, while working under Banks at DOJ.

25. In or about December 2019, after discussing his complaint with many human resource officials at Melwood, Chase discussed his complaints with Latasha Love. Love was another human resources official at Melwood., but new at the time.

26. Chase told love everything. He informed Love about the constant bullying and harassment from Banks. He informed Love about the routine use of the words "retarded," "ni**er," and "bitch" from Banks. Chase forwarded Love all of the emails that he sent the other 6 human resources officials at Melwood. Chase also asked Love for a transfer.

27. In December 2019, after his complaints of discrimination to Love, Love went to DOJ to speak with Chase about his allegations of discrimination. During their discussion, Love stated that she "heard about him" and his allegations of discrimination. Love also discussed Chase's complaint of discrimination with Banks. After Love left the DOJ, Banks stated, "you better watch out, Love may not like you."

### Melwood's Despicable Allegation to Terminate Chase

28. In or about December 11, 2019, Banks asked Chase to work outside of his normal shift, without overtime pay. This was a routine request from Banks. But on this occasion, Chase said no.

29. On the same day, Chase called Melwood Human Resources at approximately 6:45 am to report that Banks required him to work hours outside of his normal shift again, without pay. Chase left a message with Melwood.

30. After Chase refused to work without pay, Banks threw a tantrum. Chase called Love approximately five times to alert the organization about Banks' behavior towards him.

31. After Chase finished his shift, he received a call from Love. As he walked to the metro station, Love informed him that Melwood was informed that Chase "left work early" and that Chase attempted to "kill himself." Love stated that she heard from DOJ that Chase was trying to "jump off the DOJ roof." This is despite the fact that no first responders were ever called, nor were any DOJ officers deployed for such an incident. Chase told Melwood that the allegations were laughable and completely false.

32. Notwithstanding, Melwood put Chase on "mental leave" and stated that he was not "fit for duty." Melwood required Chase to have his doctor complete a form certifying that he was fit for duty.

33. Chase's doctors immediately cleared him fit for duty.

34. Despite being cleared for duty, Melwood's Latasha Love terminated Chase from his employment on December 20, 2019.

35. Banks was eventually terminated by the DOJ.

### Chase's Allegations of Unpaid Overtime

36. Chase's worked a 40-hour paid shift at DOJ. Chase worked from 7:00 am to 4:00 pm at DOJ.

37. When Chase started working at DOJ in March 2018, his supervisor Banks required him to begin his shift at 6:30 am. However, Banks prohibited Chase from clocking-in. In March 2018, Banks told Chase that if he did not work off the clock or arrive at 6:30 am every day, he would be terminated.

38. Between 6:30 am to 7:00 am, Chase was required to work around the building to check entrances, address each floor to check for issues on each floor, run errands for Banks, get keys to unlock rooms, unload equipment. Chase performed these tasks between 6:30 am to 7:00 am. This is despite the fact that Banks and Derrick Johnson were tasked to perform these tasks at 5:30 am.

39. Chase was required to work between 6:30 am to 7:00 am without pay, from March 2018 to the date of his termination on December 20, 2019.
40. Banks routinely required Chase to perform work tasks after his shift ended at 4:00 pm or face termination.
41. After 4:00 pm, Banks routinely required Chase to stay at the DOJ and perform tasks prior to the night crew arrival. Banks required Chase to conduct recycling tasks, dumping, refill chemical bottles, set up trash bags for the following day, and set up rag towels for the following day. Chase completed these tasks from approximately 4:00 pm to 4:30 pm.
42. This is despite the fact that Johnson was supposed to perform these tasks, and another lead janitor was present at 4:00 pm to perform these same tasks between, 8:00 am to 5:00 pm.

## CAUSES OF ACTION

### Count 1: Maryland Fair Employment Practices Act
*Hostile Work Environment*

43. Chase incorporates every preceding paragraph as alleged above.
44. Chase was subject to discriminatory severe or pervasive conduct by Defendant based on Plaintiff's disability.
45. WHEREFORE, Chase prays for nominal damages; compensatory damages, in an amount to be determined at trial; punitive damages, in an amount to be determined at trial; attorney's fees and the costs of this litigation; back pay, front pay, and future benefits, as may be appropriate; pre- and post-judgment interest; and any other relief the Court deems necessary and appropriate.

### Count 2: Maryland Fair Employment Practices Act
*Retaliation*

46. Chase incorporates every preceding paragraph as alleged above.

47. Chase engaged in protected activity after complaining of discrimination. He was subsequently terminated because of the protected activity.

48. WHEREFORE, Chase prays for nominal damages; compensatory damages, in an amount to be determined at trial; punitive damages, in an amount to be determined at trial; attorney's fees and the costs of this litigation; back pay, front pay, and future benefits, as may be appropriate; pre- and post-judgment interest; and any other relief the Court deems necessary and appropriate.

**Count 3: Violation of Fair Labor Standards Act
(29 U.S.C. § 201 *et seq.*)**
***Unpaid Overtime***

49. Chase incorporates every preceding paragraph as alleged above.

50. FLSA requires an employer to pay an employee overtime wages in the amount of 1.5 times the employee's base wage for all hours worked each week in excess of 40 hours.

51. At all relevant times Defendant was an employer under FLSA and Chase was an employee eligible for overtime wages under FLSA.

52. At all relevant times Defendant was an employer under FLSA and Chase was an employee eligible for overtime wages under FLSA.

53. Defendant are vicariously liable for all the actions of Piazza and every other employee involved in the events giving rise to Chase's Complaint.

54. Defendant knew Chase worked at least 10 to 15 overtime hours each workweek, or Defendant allowed Chase to work at least 10 overtime hours each workweek.

55. Defendant was required under FLSA to compensate Chase at the overtime rate of one-and-one-half times a base rate commensurate with her employment for all the overtime hours she worked; however, Defendants failed or refused to meet that requirement.

56. Defendant misclassification of Chase as an employee ineligible for overtime wages and its failure or refusal to pay her overtime wages, as required by FLSA, were willful and not in good faith.

WHEREFORE, Chase prays for judgment against Defendants, jointly and severably, and in her favor, nominal damages; all unpaid overtime wages, in an amount to be proven at trial, plus an equal amount in liquidated damages; pre- and post-judgment interest; attorney's fees and the costs of this litigation; and any other relief the Court deems necessary and appropriate.

## JURY DEMAND

## PLAINTIFF DEMANDS TRIAL BY JURY

Dated: April 14, 2021

By: */s/Ikechukwue Emejuru*
Ikechukwu Emejuru
**Emejuru Law L.L.C.**
8403 Colesville Road
Suite 1100
Silver Spring, MD 20910
Telephone: (240) 638-2786
Facsimile: (240)-250-7923
iemejuru@emejurulaw.com